## Caskey v. Williams Brothers.

(Decided December 18, 1928.)

74

LUKINS & JONES for appellants.

WALTER LAPP for appellees.

OPINION OF THE COURT BY COMMISSIONER STANLEY—
Affirming.

On March 16, 1926, appellees, Andrew and James Williams, partners doing business as Williams Bros., gave to appellants, William E. Caskey, Jr., Thos. B. Cromwell, Phil T. Chinn, and John A. Judy, an option to buy 57 thoroughbred race horses, some of which were located in Kentucky and others in Oklahoma. The terms of the option were that appellants should pay $70,000 for the horses, $10,000 when the option was exercised, on or before April 1, 1926, and $60,000 on or before May 1, 1926; with the further stipulation that the horses should be subsequently sold at auction, and if they brought more

than $85,000 the parties were to divide the excess equally. In the negotiations, appellees were represented by their brother, R. D. Williams, and appellants by Caskey and Cromwell. The litigation arises from that option and involves two questions: One respecting the liability for certain stallion fees, and the other the loss of one of the horses by death between the date of the option and the time it was exercised.

The evidence introduced in behalf of the appellees was to the effect that after the option-contract had been executed (both parties signing), Williams advised Caskey and Cromwell that three of the mares were then at the stable of W. S. Knebelkamp, in Louisville, to be bred to a certain stallion owned by him, and inquired of Caskey as to their wishes respecting that matter; Caskey asked him what arrangements he had made with Knebelkamp; Williams advised him that he had none except that the stud fee was to be $600, and that he would guarantee that the cost of keeping the mares would be reasonable, and then Caskey directed him to go ahead and breed them. On April 1st, when the option was exercised and the $10,000 paid, Caskey asked Williams if he had made any arrangements with Knebelkamp about the mares, and was told about the same thing as in the previous conversation.

For the appellants, Caskey and Cromwell denied that there was any such conversation on the day the contract was signed as related. They testified the first they heard about this matter was on April 1st, when Mr. Williams in conversation with Caskey, brought up the subject and told him that the mares had been bred at Knebelkamp's and there would be some additional expense, and he advised Williams he and his associates would pay whatever was agreed upon in the original contract. The bill for the stallion fees, $600, and maintenance while at Knebelkamp's, $150, was delivered to appellants, and Knebelkamp testified that on the day of the auction sale, Mr. Cromwell said he would send check for the bill. This Mr. Cromwell denied.

The appellees paid this bill, and filed suit against appellants to recover the sum of $750. The question was presented to the jury by an apt instruction that they should find for the appellees if they believed from the evidence that after the option had been signed there was an agreement between the parties that the appellants

should pay these stud fees. The conflict in the evidence, of course, made it a question for the jury, and they decided that there was such a supplemental agreement. The appellants contend that, even if there was such a conversation as the appellees proved, it was merged in the writing, which contained the whole engagement of the parties, and its terms could not be varied by proof of previous or contemporaneous oral negotiations. Upon this ground they say they were entitled to a judgment under a peremptory instruction. That is undoubtedly a correct exposition of the law where the facts justify its application, and the lower court did apply it to the claim for boarding the mares at Knebelkamp's, amounting to $150, by not submitting it to the jury. It was specifically provided in the writing that Williams Bros. should keep and maintain the horses until May 1st, and so much of the conversation as related to their maintenance was at variance with the writing. But the matter of breeding the mares was not covered. At the time they had not been bred, and as to whether or not they should be was submitted to the prospective buyers. It has never been held that where parties have entered into a written contract they are precluded from thereafter making an oral contract supplementing or adding to the writing, where it is not required to be in writing. Paducah Grain & Elevator Co. v. Marshall, 196 Ky. 673, 246 S. W. 30. The evidence of the appellees respecting the breeding of the mares was that such agreement was supplemental and additional to that covered by the writing, while the evidence of appellants was that the subject was never mentioned until April 1st. The court, therefore, did not err in submitting this matter to the jury.

■ The answer of the appellants was made a counterclaim, in which it was asserted that the contract called for the sale and purchase of 57 horses and colts, and only 56 were delivered. Recovery of $3,000 was asked because of the breach. The facts as to this matter are these: Mr. Caskey went to Oklahoma in the latter part of March to see the horses. On his way home he saw R. D. Williams, in Louisville, and told him that one of the colts had broken his neck; another had lost his eye; and one was sick; and he asked Williams if some reduction would not be made in the agreed price. Williams advised him that they would make no reduction, and that he and his associates could take the horses as they were or

let them alone. Caskey advised him that he would have to take the matter up with his associates, and that evening he called Williams from Lexington by phone and insisted on a reduction in the price, to which Williams responded he could take the horses or leave them, but no reduction would be made. The next morning Williams received a letter from Caskey and Cromwell calling attention to the loss of one colt and the condition of the others, and referring to the option to buy 57 horses. They further wrote: "We are now ready to exercise the option with the understanding and reservation that an adjustment will be made relative to your inability to deliver the full eleven yearlings." No response whatever was made to this letter, nor was anything said about the matter either on the day the $10,000 was paid or later when the $60,000 was paid. Indeed, no claim was made until after the suit was filed, which was several days after the auction sale; and one of the parties admits that they would have assumed the loss if there had been a good sale and the other matter had not been brought up against them by Williams. The appellants urge upon us that the court should have held as a matter of law that they were entitled to recover the reasonable market value of the colt, as the trade was consummated after they had attached the condition to the acceptance of the option, which condition they insist the appellees agreed to by their silence. In submitting this issue to the jury, the court instructed them they should find for the defendants (now appellants) on their counterclaim the value of the colt not delivered, if they should believe from the evidence that, before they exercised their rights under the option on April 1, 1926, the plaintiffs through their agent, R. D. Williams, acquiesced in the claim of the defendants for an adjustment in the sale price.

An option is not a contract for the purchase of property, but an offer to sell, and grants to the optionee the privilege of purchasing the property if he elects to do so according to the very terms in which the proposition is made without qualification or condition. Postal Telegraph-Cable Co. v. Louisville Cotton Oil Co., 136 Ky. 843, 122 S. W. 852, 125 S. W. 266; Gold Spring Distilling Co. v. Stitzel, 150 Ky. 457, 150 S. W. 516; Stamper v. Combs, 164 Ky. 733, 176 S. W. 178. The offer of appellees to sell the 57 horses for the stated consideration was open until accepted without qualification, and appellants' letter of

acceptance was not of that character. It drew to the attention of the optionors that they could not deliver the number of horses provided for in their offer, and was in effect a counteroffer to take such as they were able to deliver with an adjustment in the price. Williams Bros. had already declined to accede to the request for such adjustment, and ignored the later request contained in the letter. Having gone ahead and complied with the terms of the option, it was apparent that one of the parties had yielded and acquiesced in the demands of the other. Such was bound to have been true, else there would have been no meeting of the minds, which is a very necessary element of an agreement or contract. The court properly submitted to the jury the question whether or not the optionors had agreed to the conditions attached to the acceptance of their offer to sell. If they had not so acquiesced, then it followed that appellants had waived the condition imposed by them and concluded the transaction in accordance with the original proposition. Not only does the payment of the consideration in full, in accordance with the terms of the original contract, tend to prove that this condition was waived, but the testimony of the parties themselves, that they would not have asserted this claim had Williams Bros. not claimed the stud fees, fully authorized the verdict.

Performance, or even partial performance, of a contract will obviate the original lack of a meeting of the minds of the parties, where an assent may be deduced from the conduct of the party not bound. This was held in L. & N. R. Co. v. Coyle, 123 Ky. 854, 97 S. W. 772, 30 Ky. Law Rep. 201, 8 L. R. A. (N. S.) 433, 124 Am. St. Rep. 384 (rehearing denied 123 Ky. 854, 99 S. W. 237, 30 Ky. Law Rep. 567, 8 L. R. A. [N. S.] 433, 124 Am. St. Rep. 384), where the letters exchanged between the parties constituting the contract did not show a meeting of the minds, but subsequent conduct of the parties respecting the subject matter made the obligations binding.

The judgment was properly awarded appellees on the counterclaim for another reason: It is well established that a purchaser may not accept delivery, knowing the price being claimed by the seller, and then refuse to pay that price. The rule was applied in Caldwell & Drake v. Cunningham, 162 Ky. 272, 172 S. W. 498, in which there was a controversy over the terms of a sale of some lumber accepted by the purchasers. In that opinion

we thus stated the principle: "When there is disagreement and misunderstanding, as in the case before us, between the seller and the buyer as to the terms of the contract, and the property is delivered before this is settled, the buyer has the election to reject or to accept and use it as he intended, but, if he adopts this latter course, with knowledge of the difference between himself and the seller as to the price, he must pay the price charged, and cannot defeat the claim of the seller by insisting that he bought the property on different terms or at a different price. He has made his election and is bound by it."

Appellants not only accepted the 56 horses, but paid the full price, knowing that the appellees had positively refused to accede to their request to abate so much of the purchase price as represented the value of the lost colt. They are bound by their election.

It follows, therefore, that the judgment should be and is affirmed.